IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MILLER | : | CIVIL ACTION |
| | : | NO. 07-1338 |
| v. | : | |
| | : | |
| FIRST LIBERTY INSURANCE | : | |
| CORPORATION, d/b/a LIBERTY | : | |
| MUTUAL INSURANCE GROUP | : | |

O'NEILL, J.                                                    JUNE 17, 2008

## MEMORANDUM

On March 8, 2007 plaintiff John Miller filed a complaint in the Pennsylvania Court of

Common Pleas of Philadelphia County asserting claims for breach of contract and bad faith

against defendant First Liberty Insurance Corporation, d/b/a Liberty Mutual Insurance Group.

Defendant removed the matter to this Court on April 4, 2007 pursuant to 28 U.S.C. §§ 1441 and

1446.  I have jurisdiction pursuant to 28 U.S.C. § 1332.  Presently before me are defendant's

motion for summary judgment, plaintiff's response, and defendant's reply.

## BACKGROUND

Defendant issued a LibertyGuard Deluxe Homeowners Policy to plaintiff John J. Miller

and Frances T. Miller providing coverage for plaintiff's dwelling located at 6 Republic Avenue

in Norristown, Pennsylvania for the policy period March 17, 2006 to March 17, 2007.

On April 11, 2006 the Policy for plaintiff's dwelling was in full force and effect.  On that

date plaintiff was in the process of putting a second floor on top of an existing addition.  The

addition, which was built in 1984, experienced termite infestation in 1996.  Plaintiff addressed

the infestation by hiring an exterminator in 1996, but the termites caused structural damage to the

1

walls of the addition that remained hidden until plaintiff's contractors removed the roof in April

2006.  Determining that the structural condition of the addition walls would not support a second

floor, the contractors decided to tear down the walls as a safety precaution.

On April 11, 2006 plaintiff submitted a claim to defendant for damage to the insured

property.  The designated loss date for plaintiff's claim was 1996, the year in which the termite

infestation was discovered and treated.  On April 12, 2006 a property adjuster for defendant

investigated plaintiff's alleged loss by taking a recorded statement.  Based upon that

investigation, defendant determined that plaintiff's claim was not covered by the Policy.  In a

letter to plaintiff dated April 12, defendant informed plaintiff that an "investigation revealed that

the damage to your Dwelling is from termite infestation" and plaintiff's Policy did not provide

coverage for the damages caused by the termite damage.  Quoting the Policy, the April 12 letter

noted that defendant "do[es] not insure . . . for loss . . . [c]aused by . . . [b]irds, vermin, rodents,

or insects . . . ."

Plaintiff subsequently referred his claim to a public adjustor at Alliance Adjustment

Group, who attempted to have defendant alter the loss date.  Defendant refused to change the loss

date and restated its conclusion that the Policy did not provide coverage for plaintiff's loss by

again quoting the relevant Policy language in a letter to plaintiff and Alliance dated July 17,

2006.  The July 17 letter further noted that the Policy did not provide coverage where the insured

neglected to use all reasonable means to save and preserve the property during and after the loss,

and quoted the Policy language regarding the insured's duties after loss, including the duty to

"[g]ive prompt notice to us or our agent."

Plaintiff contends that the Policy provides coverage for his loss based on the "collapse"

provision.  Under Item 8, the Policy states: "We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: . . . c. Hidden insect or vermin damage. . . ."  The Amendatory Endorsement to the Policy defines "collapse" as follows:

> (1) Collapse means that sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.
> (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
> (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
> (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact.  Id. at 322-23.  If the moving party sustains the burden, the

nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial.  See
Anderson, 477 U.S. at 255.  Rule 56(e) provides that when a properly supported motion for
summary judgment is made, "an adverse party may not rest upon the mere allegations or denials
of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise
provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."
Fed. R. Civ. P. 56(e).  The adverse party therefore must raise "more than a mere scintilla of
evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by
relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v.
Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  However, the "existence of disputed
issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of
credibility against'" the moving party.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir.
1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

DISCUSSION

I.       Breach of Contract

  To maintain an action for breach of contract under Pennsylvania law plaintiff must
demonstrate: (1) the existence of a contract, including its essential terms, (2) a breach of a duty
imposed by the contract and (3) resultant damages.  Omicron Sys., Inc. v. Weiner, 860 A.2d 554,
564 (Pa. Super. Ct. 2004), quoting J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d
1269, 1272 (Pa. Super. Ct. 2002).

  In 401 Fourth Street, Inc. v. Investors Insurance Group, the Pennsylvania Supreme Court
set forth "the well-established rules" of insurance contract interpretation:

4

> The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury.  The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy.  When the language of the policy is clear and unambiguous, a court is required to give effect to that language.  When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.  Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  Finally, [i]n determining what the parties intended by their contract, the law must look to what they clearly expressed.  Courts in interpreting a contract, do not assume that its language was chosen carelessly.  Thus, we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties.

879 A.2d 166, 171 (Pa. 2005) (citations and quotation marks omitted) (alterations in original).

Though it did not consider the precise meaning of the term "collapse" in 401 Fourth Street, the Pennsylvania Supreme Court noted that "[h]istorically, our Court has considered the policy term 'collapse' to require the sudden falling together of a structure." Id. at 172 n.2, citing Kattelman v. Nat'l Union Fire Ins. Co. of Pittsburgh, 202 A.2d 66, 67 (Pa. 1964); Skelly v. Fid. & Cas. Co. of New York, 169 A. 78, 79 (Pa. 1933); Dominick v. Statesman Ins. Co., 692 A.2d 188, 190-91 (Pa. Super. Ct. 1997).

Analyzing the language of the insurance policy in 401 Fourth Street the Pennsylvania Supreme Court found ambiguity where the defendant stated, "We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse." Id. at 174.  As the policy covered "not only loss for a collapse, but also the *risk* of loss *involving* a collapse," the Court reasoned that the provision was ambiguous because it contemplated broader coverage than policy language simply employing the term "collapse." Id. (emphasis in original).  However even in the face of this ambiguity the Court reasoned that "to interpret the broad policy language

5

to cover substantial impairment of structural integrity, we believe to be too distant from the

concept contained in our existing case law which requires the falling of a building." Id.  The

Court warned that such an interpretation "would possibly convert the policy into a maintenance

agreement by permitting recovery for damage which, while substantial, does not threaten collapse

of the structure." Id.[1]

In this case plaintiff voluntarily removed the roof of the addition to his dwelling and then

voluntarily took down the walls to the addition after finding structural damage due to a past

incidence of termite infestation.  In response to defendant's motion for summary judgment

plaintiff acknowledges that for his breach of contract claim "[t]he only remaining question is

whether the voluntary tearing down of the structure is a collapse within the meaning of the law."

I conclude that the collapse provision of the Policy is unambiguous and covers neither the

structural damage of plaintiff's walls caused by termite infestation nor the voluntary tearing

down of the walls due to such structural damage.  In accordance with reasoning of the

Pennsylvania Supreme Court in 401 Fourth Street, I note that construing the Policy to cover

voluntary tearing down due substantial impairment of structural integrity would convert the

policy into a maintenance agreement in contravention of the clear language of the parties'

---

[1]Though plaintiff urges me to define "collapse" as "any serious impairment of structural
integrity" in accordance with cases from other states, see, e.g., Gov't Employees Ins. Co. v.
DeJames, 261 A.2d 747 (Md. 1970); Nationwide Mut. Life Ins. Co. v. Tomlin, 352 S.E.2d 612
(Ga. Ct. App. 1986), Pennsylvania law governs this action.  I find the Pennsylvania Supreme
Court's decision in 401 Fourth Street instructive and will not adopt the reasoning of courts from
other jurisdictions.

agreement.

The Policy unambiguously defines collapse in conformity with the Pennsylvania Supreme Court's definition – the "sudden and entire falling down or caving in of a building or any part of a building" – and states, "We insure for direct physical loss to covered property involving collapse of a building or any part of a building." Unlike the policy implicated in <u>401 Fourth Street</u>, there is nothing in the Policy language at issue in this case to suggest broader coverage for "risk of loss involving collapse." To the contrary, as noted above, the Amendatory Endorsement to the Policy explicitly prohibits coverage for risk of loss involving collapse: "A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse."[2]

_____

[2]Plaintiff further notes that the Court of Appeals, interpreting New Jersey law, determined that the term "collapse" includes a collapse which has not yet occurred but is "imminent." <u>See</u> <u>Buczek v. Continental Ins. Co.</u>, 378 F.3d 284, 290 (3d Cir. 2004) ("[T]he definition of collapse must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by.") (citation and internal marks omitted). The Court of Appeals noted three definitions of imminent that might apply: "ready to take place: near at hand"; "likely to occur at any moment: impending"; "likely to happen without delay." <u>Id.</u> at 291.

Though the Pennsylvania Supreme Court in <u>401 Fourth Street</u> briefly addressed whether "collapse" includes "imminent collapse," <u>see</u> 879 A.2d at 173 (acknowledging that some courts treat imminent collapse as covered under the traditional view of the term "collapse"), it did so in the context of a policy covering "risk of loss involving collapse" and determined not to reconsider the "precise meaning of the term 'collapse,'" <u>see id.</u> at 172 n.2.

Additionally, I conclude that the collapse provision of the Amendatory Endorsement to the Policy unambiguously provides that "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse." That is, because plaintiff's Policy in unambiguous terms provide no coverage for a building that is in danger of falling down or caving in, the Policy does not provide coverage for the circumstances presented by plaintiff's claim. Where the policy is clear and unambiguous, I am required to give effect to that language. I again note that construing the Policy to cover substantial impairment of structural integrity would be to convert the collapse provision into a maintenance agreement.

Finally, plaintiff acknowledges that only "once the roof was removed, it was in the best interest of public safety to tear down the walls." Therefore, even if the collapse provision of the

Because plaintiff presents no evidence of a sudden and entire falling down or caving in of a building or any part of a building, I find there was no "collapse" under the clear and unambiguous terms of the Policy.  Therefore I will grant summary judgment in favor of defendant with respect to plaintiff's breach of contract claim.

II.    Bad Faith

Plaintiff's bad faith claim against defendant, an insurance company, is governed by 42 Pa. C.S.A. § 8371.[3]  Under Pennsylvania law "'bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy."  Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994), citing Black's Law Dictionary 139 (6th ed. 1990).  "For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith."  Id.,

---

Policy somehow could be read to cover imminent collapse, it still would not provide coverage for plaintiff's loss as any imminence of collapse resulted not from termite infestation but from the voluntary taking down of another part of the structure: a circumstance not covered by the Policy.

[3]The statute provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.

citing <u>Black's Law Dictionary</u> 139.  "[T]he insurer must accord the interest of its insured the same faithful consideration it gives its own interest."  <u>Cowden v. Aetna Cas. & Sur. Co.</u>, 134 A.2d 223, 228 (Pa. 1957).  "Bad faith cases are commonly decided at the summary judgment stage, with the court determining, as a matter of law, that the insurer had a reasonable basis for its actions."  <u>Quaciari v. Allstate Ins. Co.</u>, 998 F. Supp. 578, 581 n.3 (E.D. Pa. 1998).

Plaintiff presents no evidence to support his conclusory allegation that "[i]t is abundantly clear that Defendant had a mindset of denial from the inception of this claim and was not going to waiver on its pre-conceived desire to deny the claim."  Contrary to plaintiff's contention, the record reflects that defendant had multiple reasonable bases to deny the claim.

First from the record I conclude defendant reasonably determined that the loss date of plaintiff's claim was 1996 and reasonably used that loss date as one basis for denying coverage as the Policy required plaintiff to give prompt notice of loss.  The conversation among defendant's claims adjustor, plaintiff and plaintiff's contractor revealed that the addition walls were taken down voluntarily due to structural damage from termite infestation.  Plaintiff explained that the addition experienced termite infestation in 1996 and further declared that no termites were present on the premises between treatment in July 1996 and start of construction in April 2006.  Further, in response to the question "When did you start noticing this damage?" plaintiff responded, "I don't know wh- when it all started with the termites."

Second defendant's claims adjustor reasonably discerned no basis for coverage under the Policy where the conversation between defendant's claims adjustor and plaintiff revealed that the walls of the addition were taken down voluntarily as a result of termite damage.  Plaintiff's representations indicate no "sudden and entire falling down or caving in of a building or any part

of a building" that would implicate the collapse provision of the Policy.

Finally to the extent that defendant neglected the possibility of collapse defendant was at most negligent or demonstrated bad judgment, and it is well-established that mere negligence or bad judgment is not bad faith.  Because plaintiff fails to produce evidence that defendant acted with a dishonest purpose or meant to a breach of a known duty through some motive of self-interest or ill will, I conclude defendant did not act in bad faith.  Therefore I will grant summary judgment in favor of defendant with respect to plaintiff's bad faith claim.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MILLER | : | CIVIL ACTION |
| | : | NO. 07-1338 |
| v. | : | |
| | : | |
| FIRST LIBERTY INSURANCE | : | |
| CORPORATION, d/b/a LIBERTY | : | |
| MUTUAL INSURANCE GROUP | : | |

ORDER

AND NOW, this 17th day of June 2008, upon consideration of defendant's motion for summary judgment, plaintiff's response and defendant's reply, it is ORDERED that defendant's motion is GRANTED.  Judgment is entered against plaintiff and in favor of defendant with respect to all claims.


s/Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.